UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

CHARLES DIXON,             )
                           )
    Petitioner,        )
                           )
v.                         )    Case No. CV413-109
                           )
WARDEN DARRELL HART,       )
                           )
    Respondent.        )

## **REPORT AND RECOMMENDATION**

Charles Dixon seeks 28 U.S.C. § 2254 relief from a state court conviction. Doc. 1.[1] In a prior order, the Court examined whether his § 2254 petition is time-barred under 28 U.S.C. § 2244(d)(1), which requires petitioners to seek § 2254 relief within one year of, for example, newly discovered evidence underpinning a habeas claim, 28 U.S.C. § 2244(d)(1)(B)-(D). Doc. 3, *reported at* 2013 WL 2385197. Because the Court lacked judicial records supporting Dixon's filing-date assertions and

---

[1] The Court dismissed his first petition so he could exhaust his state court remedies. *Dixon v. Toole*, CV411-196, 2011 WL 6046503 (S.D. Ga. Dec. 5, 2011) (*Dixon I*). He now claims he did, CV413-109 at 9 (*Dixon II*), and the state does not dispute this. Doc. 12-1.

he was otherwise unclear,[2] it directed the state to respond. Doc. 3 at 9. It has done so by moving to dismiss on untimeliness grounds. Doc. 12.

## I. BACKGROUND

Dixon "was convicted of the malice murder of Sundie Cutter and the trial court sentenced him to life imprisonment." *Dixon v. State*, 275 Ga. 232, 232 (May 28, 2002). That court recounted the facts:

> [He] and the victim had a lengthy and tempestuous relationship. Shortly before the homicide, she ordered him out of the apartment they shared. On the night before she died, Ms. Cutter met another man and invited him to come home with her. He left in the early morning hours. At some point shortly thereafter, the murderer entered the victim's bedroom, possibly by breaking the window. When discovered, the victim's body was partially wrapped in a bedspread stained with a mixture of her and Dixon's blood. She was

---

[2] Calculating timeliness under § 2244(d)(1) requires courts to determine when a petitioner has filed something, and that is complicated when they are imprisoned because they cannot simply walk to a nearby mailbox. Federal courts thus follow the mailbox rule, under which courts credit the start date of something by the date on which the prisoner signs his filing and places it within his prison's mail system. *See French v. Carter*, 828 F. Supp. 2d 1309, 1315-16 (S.D. Ga. 2012).

But as explained in *Biggins v. Barrow*, 2013 WL 3047903 at * 1 (S.D. Ga. June 17, 2013), "Georgia follows a hybrid rule, wherein the initial state habeas petition filing date is established by the state habeas court clerk's "filing-stamp" date, while appeals from an adverse state habeas ruling are governed by the mailbox rule. *Roberts v. Cooper*, 286 Ga. 657, 660-61 (2010) (mailbox rule did not apply to an initial *pro se* petition for habeas relief but was instead limited to appeals from rulings on habeas petitions); *Lewis v. Howerton*, 2012 WL 4514044 at * 2 n. 3 (N.D. Ga. Sep. 30, 2012) ("the 'mailbox rule' only applies to appeals of denials of habeas corpus petitions, not to the filing of such petitions in the trial court.") (emphasis omitted)." *Id.* at * 1 n. 1.

2

strangled with a telephone cord. Two young children, one of whom was the *son* of Dixon and Ms. Cutter, witnessed the murder. They identified Dixon as the killer. While incarcerated, appellant made an incriminating admission to a fellow inmate, acknowledging that he strangled Ms. Cutter because she had been with another man.

*Dixon*, 275 Ga. at 232 (emphasis added).

As the respondent explains, and Dixon does not dispute, he filed his first state habeas petition, raising ineffective assistance of counsel and other claims, on September 8, 2003. CV413-109, doc. 16-1; doc. 12-1 at 1. Following an April 21, 2005 hearing, that court denied relief on June 6, 2005. Doc. 18-1. Dixon's application for a certificate of probable cause to appeal the denial of the state habeas relief was itself denied on April 26, 2006. Doc. 18-2.

Dixon pressed on. He filed his second state habeas petition on October 13, 2006. Doc. 18-3 at 1. Following another hearing on December 21, 2006, it was dismissed as successive on January 12, 2007. Doc. 18-5 at 5. "To the best Respondent can determine, [Dixon] did not file a certificate of probable cause to appeal the dismissal, and the thirty-day period in which an application could have been filed, pursuant to O.C.G.A. § 9-14-52, expired on February 11, 2007." Doc. 12-1 at 2.

3

Dixon does not dispute this. Doc. 13.

As he did in *Dixon I*, however, he claims that on March 22, 2010 he received a recanted-testimony affidavit from his son. CV411-196, doc. 18 at 2; CV413109, doc. 1 at 9; doc. 13 at 2. He says he filed a "Notice of Intent to File Extraordinary Motion For New Trial" on or about April 2, 2010, doc. 13 at 2, but the state furnishes no record of that and neither does he. And it is undisputed that Dixon did not actually file that extraordinary motion until January 18, 2011.[3] Doc 18-6 at 1; doc. 13 at 3.[4] It was denied on May 3, 2011. Doc. 18-7.

The next part of the procedural history is disputed. Dixons says (but does not document) that he appealed that May 3, 2011 ruling to the Georgia Supreme Court on May 18, 2011 and it was denied on June 16, 2011. CV411-196, doc. 18 at 3; CV413109, doc. 1 at 9; doc. 13 at 3. He also says that that court issued its "remitter" on June 27, 2011. Doc. 13 at 3. Again, however, he furnishes no documentation, and neither does

---

[3] He does not explain why it took him over 9 months to actually file the motion.

[4] The state says he did so on "January 28, 2011," doc. 12-1 at 2, but its own supporting documentation shows it was January 18, 2011. Doc. 18-6 at 1 (file-stamped date).

the state. Instead, the state intimates that Dixon took no appeal:

> Under Georgia law, Petitioner could have pursued a discretionary appeal from the denial of the extraordinary motion, pursuant to O.C.G.A. § 5-6-35(7), but he did not. The thirty-day period for filing a notice of appeal, pursuant to O.C.G.A. § 5-6-38, in order to pursue a discretionary appeal expired on June 2, 2011.

Doc. 12-1 at 3.

In any event, Dixon then went off the procedural rails. Instead of invoking state *habeas* court relief, he filed his first § 2254 petition here on July 1, 2011. *Dixon I*, CV411-196, doc. 1 at 19; CV413-109, doc. 13 at 3. He cited "an affidavit from his son, who ha[d] recanted his trial testimony, and argue[d] that his motion is timely under 28 U.S.C. § 2244(d)(1)(D), which allows a prisoner to file his petition within one year of the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Dixon I*, CV411-196, doc. 19 at 2, *reported at* 2011 WL 6046503 at * 1 (quotes and cite omitted).[5]

---

[5] Certain statutory exceptions to the statute of limitations exist. Examples: where the untimely filing was caused by state-impeded relief, new constitutional rights have been created by the Supreme Court, or newly discovered facts underpin the claim. *See* 28 U.S.C. § 2244(d)(1)(B)-(D); *Gonzalez v. Thaler*, 132 S. Ct. 641, 653 (2012).

But because he had failed to exhaust available state remedies (i.e., file a state habeas petition on his new claim), *id.*, this Court dismissed his petition without prejudice. *Id.* at * 2, *adopted*, 2011 WL 6257173 (S.D.Ga. Dec. 14, 2011). Dixon then filed a third state habeas petition on December 30, 2011. CV413-109, doc. 1 at 4 ("Superior Court of Wilcox County"); doc. 13 at 3; doc. 18-8 at 1. Following a hearing, doc. 18-9, that court denied it as untimely, doc. 18-10 (May 31, 2012), from which Dixon appealed on June 22, 2012. Doc. 18-11 at 10; doc. 13 at 4. The Georgia Supreme Court rejected that appeal, also as untimely, on April 15, 2013. Doc. 18-12 (he missed the 30-day deadline for filing). Dixon filed the instant § 2254 petition on April 23, 2013. Doc. 1 at 8 (signature date).

## II. ANALYSIS

### A. Governing Law

Courts enforce a one-year statute of limitations for state prisoners wishing to file a federal habeas petition. 28 U.S.C. § 2244(d)(1). The

---

"Multiple courts have held that a witness's recantation can serve as the factual predicate from which the limitations period begins to run." *DiCaprio-Cuozzo v. Johnson*, 744 F. Supp. 2d 548, 557 (E.D. Va. 2010) (collecting cases); *see also id.* (where "there is no evidence that the petitioner possibly could have discovered the recantation previously, the date of the recantation becomes the date on which the limitations period begins to run.").

6

period begins to run from the last of four different triggering events, typically from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). But the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." *Id.* § 2244(d)(2). *Rich v. Secretary for Dept. of Corr.*, 512 F. App'x 981, 982-83 (11th Cir. 2013); *Munchinski v. Wilson*, 694 F.3d 308, 327 (3rd Cir. 2012). "An application is properly filed when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Rich*, 512 F. App'x at 983 (quotes and cite omitted).

The one-year limitations period imposed by 28 U.S.C. § 2244(d)(1) requires petitioners to keep the ball rolling at all times. *Everett v. Barrow*, 861 F. Supp. 2d 1373, 1375 (S.D.Ga. 2012). That period "applies on a claim-by-claim basis in a multiple trigger date case." *Zack v. Tucker*, 704 F.3d 917 (11th Cir. 2013); *Mathis v. Secretary, Florida Dept. of*

*Corrections*, 2013 WL 1610696 at * 1 (M.D. Fla. Apr. 15, 2013). Thus, after an adverse ruling, the petitioner must take his case to the next stage of review because the one-year clock continues to tick in the meantime. *Everett*, 861 F. Supp. 2d at 1375.

A new evidence affidavit "might extend the time for filing a § 2254 application on the ground of newly discovered evidence, *see* 28 U.S.C. § 2244(d)(1)(D), or might overcome the timeliness bar by showing actual innocence, *see Lopez v. Trani*, 628 F.3d 1228, 1230–31 (10th Cir. 2010)." *Foust v. James*, 505 F. App'x 727, 729 (10th Cir. 2012). But as explained in *Frederick v. McNeil*, 300 F. App'x 731 (11th Cir. 2008), a petitioner must also show that he "exercised due diligence in discovering the factual predicate for his claim." *Id.* at 734, *later appeal*, *Frederick v. Secretary Dep't of Corrs.*, 481 F. App'x 472 (11th Cir. 2012).

Even at that, a petitioner who sits on a claim and thus creates time gaps between rulings can run out the one-year clock. *See Rivera v. Pollard*, 504 F. App'x 502, 505 (7th Cir. 2013); *Herbert v. Dickhaut*, 695 F.3d 105, 110-11 (1st Cir. 2012). His failure to timely -- and *properly* --

file a state collateral proceeding will not stop that clock. *Holmes v. Spencer*, 685 F.3d 51, 61 (1st Cir. 2012) (motion to revise and revoke sentence that did not specify grounds on which it was based was not properly filed and did not toll limitation period).

Too, "[a]n application that is untimely under state law is not 'properly filed' for purposes of tolling AEDPA's limitations period." *Gorby v. McNeil*, 530 F.3d 1363, 1367 (11th Cir. 2008) (cite omitted). So even if a state court reaches the merits, that does not automatically mean a petition was timely filed. *Evans v. Chavis*, 546 U.S. 189, 197 (2006) (noting that a state supreme court order "denying a petition 'on the merits' does not automatically indicate that the petition was timely filed" and that instead "the federal court must decide whether the filing" was timely under state law); *quoted in Gorby*, 530 F.3d at 1367. Nor does the filing of an unexhausted federal habeas petition in the middle of the state review cycle stop the clock. *Duncan v. Walker*, 533 U.S. 167, 181-82 (2001) (§ 2244(d)(2) does not toll the limitations period during the pendency of a prior federal habeas corpus petition).

Finally, once the clock expires, it cannot be restarted or reversed merely by filing a new state court or federal action. *Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir. 2000) (a state postconviction motion filed after expiration of the limitations period cannot toll the period, because there is no period remaining to be tolled*); Nowill v. Barrow*, 2013 WL 504626 at * 1 n. 3 (S.D. Ga. Feb. 8, 2013).

## B. Untimeliness

The state correctly contends that, to the extent Dixon raises claims reaching back to the conviction itself and not the new-evidence affidavit, they are time-barred. Doc. 12-1 at 4. Dixon's original conviction became final on August 26, 2002, which is 90 days following the Georgia Supreme Court's May 28, 2002 affirmance of his conviction. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002) (the one-year period of limitation does not begin to run until the ninety-day period for filing a petition for *certiorari* with the United States Supreme Court has expired); U.S. S. Ct. R. 13.3.[6]

---

[6] Under Supreme Court Rule 13.3, "[t]he time to file a petition for a writ of certiorari runs from the date of entry of the judgment or order sought to be reviewed, and not from the issuance date of the mandate[.]" *Id.* Dixon thus had ninety days in which to file a petition the United States Supreme Court for a writ of *certiorari* after the *Dixon*

He thus had until August 26, 2003, to keep the ball rolling with a properly filed state proceeding. But Dixon did not file his first state habeas petition until September 8, 2003. Hence, any "2002 conviction" claims that he now raises (he does not appear to raise any, *see* doc. 15-1) are time-barred.

The new evidence (recanting-affidavit) claim is a little more complicated. Assuming Dixon exercised diligence in obtaining his son's affidavit, the fact remains that he did not file his new trial motion until 304 days later, on January 18, 2011. Doc. 18-6. After the trial court denied that motion on May 3, 2011 (doc. 18-7) and its ruling became final 30 days later (per O.C.G.A. § 5-6-35(a)(7) & (d)) on June 2, 2011, the 365-day clock resumed ticking. Dixon thus had to start the ball rolling again within 61 days. According to the state, he let another 211 days elapse before he filed anything (e.g., a § 5-6-35(a)(7) appeal from that ruling), and his next clock-stopping filing[7] was a third state habeas petition -- on

---

court entered its May 28, 2002 judgment -- *not* its mandate. *Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006) (entry of judgment, and not the issuance of the mandate, starts the clock running for the time to petition the United States Supreme Court for *certiorari* review); *Collins v. Sec'y, Fla. Dep't of Corr*, 2013 WL 4494072 at * 2 (M.D. Fla. Aug. 19, 2013).

[7] Dixon gets it wrong in his opposition brief, where he cites the pendency of his first

11

December 30, 2011.[8] Doc. 18-8. Hence, the state concludes, that claim is time-barred, too. But as noted *supra*, Dixon claims he appealed to the Georgia Supreme Court on May 18, 2011 and it denied relief on June 16, 2011. Doc. 1 at 9; doc. 13 at 3. Even crediting Dixon's facts, he still ran out the remaining 61 days, thus time-barring his "new evidence" claim.

## C. Equitable Tolling

Dixon invokes equitable tolling grounds and, construed liberally, his argument (doc. 15-1 at 5-11) may be said to invoke *McQuiggin v. Perkins*, ___ U.S. ___, 133 S. Ct. 192 (2013). *McQuiggin* held

> that there is an "equitable exception" to the statute of limitations applicable to habeas claims, 28 U.S.C. § 2244(d), but only when the petitioner presents new evidence that "shows it is more likely than not that no reasonable juror would have convicted the petitioner." *Id*. at 1931, 1933 (alteration and quotation marks omitted). The Court's opinion expressly limited its holding to that situation, stating that "AEDPA's time limitations apply to the typical case in which no allegation of actual innocence is made." *Id*. at 1933.

*Gore v. Crews*, 720 F.3d 811, 817 (11th Cir. 2013); *see also Adkins v.*

---

(unexhausted) federal habeas petition and implies that he created no fatal time gaps. Doc. 15-1 at 4-5. As explained *supra*, that filing did not stop the clock.

[8] As the state shows, another 303 chargeable days elapsed between denial of his third petition and his April 29, 2013 filing here. Doc. 12-1 at 8-9.

*Cartledge*, 2013 WL 4459529 at * 4 (D.S.C. Aug. 16, 2013) (finding the petitioner's actual innocence claim was insufficient to excuse noncompliance with the limitations period; petitioner did not present any evidence not known at the time of trial, such as DNA evidence pointing to another person or a sufficiently-corroborated recantation; the "new evidence" was the opinion of a crime scene investigator that the crime scene did not support the testimony of the state's key witness and was largely cumulative of the evidence and argument presented at trial).[9]

The standards remain high on an actual innocence showing. *Schlup v. Delo*, 513 U.S. 298, 324 (1995) ("To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial."); *compare*

---

[9] The *McQuiggin* Court also held that, in addition to a convincing showing of actual innocence, the timing of the petition remains a factor bearing on the reliability of the evidence purporting to show actual innocence. *McQuiggin*, 133 S. Ct. at 1928; *Cruz v. United States*, 2013 WL 5753814 at *2 (S.D. Ill. Oct. 23, 2013).

*Howes v. Sec'y, Dept. of Corr*, 2013 WL 5606405 at *3 (M.D. Fla. Oct. 11, 2013) (a petitioner's proclamation of his own innocence "does not constitute 'new reliable evidence' of his actual innocence.") *with Larsen v. Soto*, ___ F. 3d ___, 2013 WL 5066813 at *10 (9th Cir. Sept. 16, 2013) (state prisoner's post-conviction evidence that five different witnesses saw different person throw knife cast doubt on his conviction for possession of deadly weapon by undercutting reliability of proof of guilt, even if it did not affirmatively prove innocence, and thus was enough to allow consideration of otherwise barred claims on federal petition for writ of habeas corpus).[10]

---

[10] As the *Larsen* court explained:

> The *Schlup* standard "is demanding," [*McQuiggin*], 133 S. Ct. at 1936, and precedents holding that a habeas petitioner satisfied its strictures have typically involved dramatic new evidence of innocence. In [*House v. Bell*, 547 U.S. 518, (2006)], for instance, DNA evidence established that semen found on a murder victim came from the victim's husband and not from House, *see* 547 U.S. at 540–41 ... and there was evidence that the husband had a history of violence toward his wife, raising an inference that he "could have been the murderer," *id.* at 548. . . . In [*Carriger v. Stewart*, 132 F.3d 463, 478–79 (9th Cir.1997) (en banc)], the prosecution's chief trial witness had confessed in open court that he himself (and not Carriger) had committed the murder for which Carriger had been convicted. *See* 132 F.3d at 471–72. In contrast, we have denied access to the *Schlup* gateway where a petitioner's evidence of innocence was merely cumulative or speculative or was insufficient to overcome otherwise convincing proof of guilt. [Cites] Thus, to satisfy *Schlup*, the petitioner's new evidence must

Here Dixon says a key eyewitness -- his son -- has recanted his testimony that Dixon shot Cutter. Doc. 15-1 at 7. He contends that this "raise[s] sufficient doubt about his guilt and undermines confidence in the result of his trial" because the physical evidence was dubious and his son swears his testimony was a "complete fabrication." *Id.* at 7-8. The state's brief was filed within months of *McQuiggin* but neither party mentions it.

The Court would ordinarily be inclined to direct further briefing. However, the state trial court's new-trial ruling moots the matter, as it is clear that Dixon -- who does not meaningfully challenge this ruling on the merits[11] -- simply cannot meet the *McQuiggin/Schlup* standard. That court noted that Dixon's newly discovered evidence:

---

convincingly undermine the State's case.

*Larsen*, 2013 WL 5066813 at * 10.

[11] He does not challenge that court's finding that his son also is a convict. Nor does he even argue that the state trial judge erred in applying state law to deny his new trial motion. Instead, he devotes much to show that his son's grandmother, who sought custody of his son, swayed him against Dixon. Doc. 15-1 at 8-10. But of course, that only goes to bolster the son's affidavit, which the trial judge was otherwise free to discredit on other grounds (*i.e.*, that his son is a convicted criminal, and not worthy of belief all these years later).

15

comes in the form of a March 10, 2010 Affidavit signed by his son, Charlie Dixon, Jr. who, judging from his signature block that includes a GDC number and a Wilcox State Prison address, has apparently sadly followed in his father's footsteps. In any event, he now recants his testimony naming his father as his mother's killer. Setting aside the question of due diligence, this affidavit submitted by [Dixon] fails to meet the newly discovered evidence standard under well-settled Georgia law. "A post-trial declaration by a State witness that his former testimony was false is not cause for a new trial." *Pryor v. State*, 179 Ga. App. 293, 294 (1986) (cit. omitted); *Brown v. State*, 209 Ga. App. 314, 316; *Drake v. State*, 248 Ga. 891, 894 (1982).

Doc. 18-7 at 2-3.

Beyond the son's affidavit, the rest of the state's evidence remains intact (even discounting the blood evidence, as Dixon challenges in his brief, doc. 15-1 at 7-8): "*Two* young children, one of whom was the son of Dixon and Ms. Cutter, witnessed the murder. They identified Dixon as the killer. While incarcerated, appellant made an incriminating admission to a fellow inmate, acknowledging that he strangled Ms. Cutter because she had been with another man." *Dixon*, 275 Ga. at 232 (emphasis added). Even fully crediting Dixon's view of the evidence (subtracting his son's testimony and the blood evidence), another child's testimony and his own incriminating admission

remain, which is enough to conclude that Dixon cannot surmount the *McQuiggin/ Schlup* standard.

This claim therefore fails, and Charles Dixon's § 2254 petition (doc. 1) must be **DENIED**. Applying the Certificate of Appealability (COA) standards set forth in *Brown v. United States*, 2009 WL 307872 at * 1-2 (S.D. Ga. Feb. 9, 2009), the Court discerns no COA-worthy issues at this stage of the litigation, so no COA should issue. 28 U.S.C. § 2253(c)(1); *see Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (approving sua sponte denial of COA before movant filed a notice of appeal). And, as there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, *in forma pauperis* status on appeal should likewise be DENIED. 28 U.S.C. § 1915(a)(3).

**SO REPORTED AND RECOMMENDED** this  5th  day of November, 2013.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA